**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**NEWPORT NEWS DIVISION**

IN RE SUBPOENA FOR DOCUMENTS
ISSUED TO PENINSULA PATHOLOGY
ASSOCIATES,

Case No. 4:22-mc-00001

**AMERICAN INTERNATIONAL INDUSTRIES' RESPONSE IN OPPOSITION TO**
**PENINSULA PATHOLOGY ASSOCIATES' MOTION TO QUASH**

1

## Table of Contents

**Introduction** ...........................................................................................................................3

**Background** ............................................................................................................................3

    I.      Peninsula Pathology Associates ...............................................................................3

    II.     Emory, T., et al., "Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients," Am. J. Indus. Med. 63: 484-489 (2020)...............................................................................................................................4

**Procedural History**............................................................................................................6

**Legal Standard** ..................................................................................................................9

**Argument** ...........................................................................................................................10

    I.      The Subpoena to Peninsula Pathology Associates was Timely Served................10

    II.     The Subpoena to Peninsula Pathology Associates Is Highly Relevant and Does Not Present an Undue Burden................................................................................11

            A.     The Requested Information is Highly Relevant........................................11
            B.     The Requested Information is not Available from Other Sources..........13
            C.     PPA Fails to Establish that the Requests are Unduly Burdensome…………………………………… ..............................................14

    III.    The Subpoenaed Materials Are Not Protected.....................................................16

            A.     The Litigation Cases Reported in Emory (2020) are not Protected Materials. ....................................................................................................17

            B.     Even if Research Protections Apply, PPA did not Produce the Required Privilege Log under Rule 45 of the Federal Rules of Civil Procedure and Waived Any Alleged Protections................................................................23

    IV.   There Is No Basis for Attorneys' Fees or Sanctions Against A-I-I. .....................24

**Conclusion** ........................................................................................................................25

## INTRODUCTION

Peninsula Pathology Associates (PPA), including Dr. Emory and Dr. Maddox specifically, (i) profit handsomely from medical-legal consulting; (ii) used expert litigation reports generated for plaintiffs' attorneys to write an article to support litigation-driven opinions; and (iii) now seek to prevent discovery of their litigation-based paper with a meritless confidentiality claim. A-I-I's subpoena was timely, does not impose an undue burden on PPA, and seeks to obtain non-privileged data derived from the litigation reports underlying the Emory (2020) article.

## BACKGROUND

### I.    Peninsula Pathology Associates.

Peninsula Pathology Associates ("PPA") is a medical group based in Newport News, VA providing regional medical services in Hampton Roads, VA, and litigation consulting services throughout the country. PPA earns hundreds of thousands of dollars a year from its litigation consulting services through its hourly charges for Dr. Emory and Dr. Maddox's litigation work. *See e.g.*, Depo. of Dr. Maddox in *Koretoff v. Arkema, Inc., et al.*, taken on January 10, 2019 at pp. 29-35, attached as Exhibit A. Litigation consulting fees are pooled at PPA and split evenly between the partners.[1] *See e.g.*, Depo. of Dr. Maddox in *Lopez v. Brenntag North America, Inc., et al.*, taken on May 13, 2020 at pp. 19, 21-22, attached as Exhibit B. PPA's litigation earnings reach nationally. For example, Dr. Maddox has testified in cases pending in Indiana, West Virginia, South Carolina, New Jersey, California, North Carolina, Maryland, Oklahoma, Arizona, Texas, and Kentucky.[2]

---

[1] PPA employs inconsistent phrasing to discuss members, partners, employees/staff of PPA.  It is unclear whether this is intentional.

[2] *See* Depo. of Dr. Maddox in *Jamrom v. A.W. Chesterton Co., et al.*, taken on December 28, 2007; Depo. of Dr. Maddox in *Jolly v. General Elec. Co., et al.*, taken on June 13, 2017; Depo. of Dr. Maddox in *Martinez v. Avon Products, Inc., et al.*, taken on February 22, 2018; Depo. of Dr. Maddox in *Weirick v. Brenntag North America, Inc., et al.*, taken on March 8, 2018; Depo. of Dr. Maddox in *Smith v. Weyerhaeuser Co., et al.*, taken on May 8, 2018; Depo. of Dr. Maddox in *Dugger v. Union Carbide Corp., et al.*, taken on July 24, 2018; Trial Testimony of Dr. Maddox in *Pipes v. Johnson & Johnson, et al.*, taken on March 18, 2019; Depo. of Dr. Maddox in *Brewer v. Air Liquid Systems Corp.*, taken on December 11, 2020; Depo. of Dr. Maddox in *Lopez v. Brenntag North America, Inc., et al.*,

Dr. Emory similarly testified in cases pending in North Carolina, Massachusetts, California, Maryland, Washington, Illinois, Iowa, Ohio, and Tennessee.[3]

## II.  Emory, T., et al., "Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients," *Am. J. Indus. Med.* 63: 484-489 (2020).

The 2020 article in question, "Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients," *Am. J. Indus. Med.* 63: 484-489 (2020), attached as Exhibit E ("Emory 2020"), is comprised entirely of litigation cases. None of the cases arose through a physician-patient relationship. The authors only included cases "reviewed in medical-legal consultation" with exposures "identified through sworn deposition testimonies and answers to sworn interrogatories provided from subjects, parents, and spouses." *Id.* p. 484-485. Two-thirds of the litigation cases came from Dr. Maddox and Dr. Emory's litigation consulting through PPA, with the remaining litigation cases reportedly originating from Dr. Kradin's litigation consulting. Ex. B at p. 146. Dr. Maddox of PPA acquired and compiled the data, relying in part on reports generated in litigation. His work also included communication with plaintiffs' counsel in the underlying cases. *Id.* at p. 157, 163-165.

After completing his compilation of litigation cases, Dr. Maddox provided it to Dr. Emory, the vice-president of PPA, who "reviewed the materials, performed the statistical analysis, and was the primary author of the manuscript." Ex. E at p. 489; Ex. B at p. 146-147, 151. Emory 2020 specifically directs correspondence related to the article to Dr. Emory's attention at Peninsula

---

taken on May 13, 2020; Depo. of Dr. Maddox in *Clouse v. Associated Drywall Suppliers, Inc.*, taken on March 17, 2021, cover pages attached as Exhibit C.

[3] *See* Depo. of Dr. Emory in *Bell v. American International Industries, Inc. et al*, taken on October 1, 2020; Depo.of Dr. Emory in *Aliotta v. Akzo Nobel Paints, LLC, et al.*, taken on June 1, 2022; Depo. of Dr. Emory *in Zimmerman v. Autozone, Inc., et al.*, taken on March 12, 2020; Depo. of Dr. Emory in *Jones v. ACandS, Inc., et al.*, taken on July 14, 2017; Depo. of Dr. Emory in *Pettie v. Brake Parts, Inc., LLC, et al.*, taken on March 3, 2021; Depo. of Dr. Emory in *Wiersema v. BASF Catalysts, LLC, et al.*, taken on June 25, 2020; Depo. of Dr. Emory in *Fankhauser v. BorgWarner Morse TEC LLC, et al.*, taken on August 14, 2019; Depo. of Dr. Emory in *Maddy v. Honeywell International Inc., et al.*, taken on January 21, 2019; Depo. of Dr. Emory in *Bailey v. Autozone, Inc., et al*, taken on January 30, 2018, cover pages attached as Exhibit D.

Pathology Associates. Ex. E at 484. PPA's vice-president, Dr. Emory, was considered the "central fulcrum" of the article with the key to the case numbers and descriptors of the litigation cases reported in the article. Ex. B at p. 154, 178.

There are no epidemiological studies demonstrating an increased risk of mesothelioma from cosmetic talc. Nonetheless, the authors surmised that "the present report of 75 cases, together with the 35 previously reported [by Moline and others] currently brings the number of individuals with confirmed diagnoses of malignant mesothelioma following repeated exposure to cosmetic talcum powder to more than 100." Ex. E at p. 485 (Emory 2020, citing Moline, J., et al., "Mesothelioma Associated with the Use of Cosmetic Talc," *J. Occup. Env't. Med.* 62(1):11-21 (2020), attached as Exhibit F).[4]

Both Emory (2020) and Moline (2020) are routinely relied upon by plaintiffs' counsel and plaintiffs' experts to establish a link between cosmetic talc exposure and mesothelioma. For example, in closing arguments, plaintiff's counsel in one case argued that Dr. Moline reached her conclusion that cosmetic talc caused the plaintiff's mesothelioma based on peer-reviewed publications, including "the Moline case series [and] the Emory case series" and emphasized that together, these case series totaled "over a hundred people exposed to cosmetic talc getting mesothelioma." Trial Transcript in *Johnson v. Johnson & Johnson, et al.*, taken on October 6, 2021 at p. 10865-66, attached as Exhibit G. In the instant case, both Dr. Moline and Dr. Finkelstein rely on Emory (2020) to bolster their opinions regarding the association between cosmetic talc and mesothelioma. *See* Dr. Moline's Report dated October 28, 2021 at p. 21, attached as Exhibit H; Dr. Finkelstein's Report dated September 7, 2021 at p. 232, attached as Exhibit I.

---

[4] Moline (2020) reports 33 cases of malignant mesothelioma, not 35 cases.

Like Emory (2020), Moline (2020) compiled cases from medical-legal consulting.[5] Although Emory (2020) purports to identify 75 new and unique cases of mesothelioma with only exposures from cosmetic talc, Dr. Maddox of PPA admitted there is possible overlap between the cases reported in Emory (2020) and Moline (2020) and recognized there are similar identifying characteristics in at least one case reported in both articles. Ex. B at p. 183-186. Dr. Maddox conceded that Dr. Emory is the appropriate person to consult to determine what measures (if any) were used to exclude duplicative cases between the articles. *Id.* Of additional concern is that at least one litigation case from Moline (2020) had an alternative known asbestos exposure. *See* Ex. J; *Bell v. Am. Int'l Indus.*, __ F.3d __, 2022 WL 16571057, at *5 (M.D.N.C. Sept. 13, 2022), attached as Exhibit K. A federal court recently expressed concerns about the apparent contradiction of claiming exclusive exposure to cosmetic talc in the article while a study subject swore under penalty of perjury to alternative exposures and opined "the fact that one of the individuals claimed otherwise has direct bearing on the study's credibility." Ex. K at *5.

The subpoena was correctly served on PPA. Further, the requests are appropriate and directly related to the central claim in this case – that cosmetic talc caused Plaintiff's peritoneal mesothelioma.

## **PROCEDURAL HISTORY**

The underlying action was filed in the New York County Supreme Court on July 8, 2020 and removed to the District Court for the Southern District of New York on July 20, 2020. Summons and Verified Complaint, *Gref v. Am. Int'l Indus., et al.* Index No. 190178/2020, attached as Exhibit L. The complaint alleges that Plaintiff's mesothelioma was caused by exposure to

---

[5] A-I-I has filed a similar subpoena regarding Dr. Moline's article and underlying, that addresses many of the issues detailed in this Opposition. *See* American International Industries' Opposition to Northwell Health, Inc.'s Motion to Modify Subpoena Served by Defendant and Cross-Motion to Enforce A-I-I's Subpoena, attached as Exhibit J.

cosmetic talcum powder products, including products purportedly sold by A-I-I. Amended Complaint, *Gref v. Am. Int'l Indus., et al.*, No. 1:20-cv-05589-GBD-VF, EFC No. 42, attached as Exhibit M. The scheduling order and deadlines have been modified multiple times in the underlying action. Scheduling Order, *Gref v. Am. Int'l Indus., et al.*, No. 1:20-cv-05589-GBD-VF, EFC No. 107 (establishing September 30, 2021 as the fact discovery deadline, with all discovery to be completed by February 18, 2022), attached as Exhibit N; Order Amending the Scheduling Order, *Gref v. Am. Int'l Indus., et al.*, No. 1:20-cv-05589-GBD-VF, EFC No. 163 (continuing fact discovery to November 30, 2021, with all discovery to be completed by May 13, 2022), attached as Exhibit O; Order Further Amending Scheduling Order, *Gref v. Am. Int'l Indus., et al.*, No. 1:20-cv-05589-GBD-VF, EFC No. 218 (allowing expert depositions to continue to July 15, 2022, with all discovery to be completed by July 29, 2022), attached as Exhibit P; Order Extending Expert Discovery, *Gref v. Am. Int'l Indus., et al.*, No. 1:20-cv-05589-GBD-VF, EFC No. 232 (extending expert depositions to July 29, 2022), attached as Exhibit Q; Order Further Extending Expert Discovery, *Gref v. Am. Int'l Indus., et al.*, No. 1:20-cv-05589-GBD-VF, EFC No. 251 (extending expert depositions to October 7, 2022) attached as Exhibit R. On September 6, 2022, the court adjourned the pretrial conference "until discovery is completed in the case." Order, *Gref v. Am. Int'l Indus., et al.*, No. 1:20-cv-05589-GBD-VF, EFC No. 252, attached as Exhibit S. The court requested that the parties notify the court "[o]nce discovery is complete." *Id.*

As of this filing, both expert and fact discovery are ongoing, and no trial date has been established. Plaintiff's expert Dr. Moline's deposition is incomplete, with a motion to compel the continuation of her deposition scheduled for December 12, 2022. Memorandum Endorsement Scheduling a Discovery Conference for December 12, 2022, *Gref v. Am. Int'l Indus., et al.*, No. 1:20-cv-05589-GBD-VF, EFC No. 270, attached as Exhibit T. Several other expert depositions

have yet to occur, with an expert deposition offered for as late as December 22, 2022. Third Amended Notice of Videotaped Deposition of Dr. Gregory Diette, attached as Exhibit U. Further, both Plaintiff and A-I-I have actively engaged in fact discovery throughout this year, with no objections lodged by either party related to timeliness. Second Amended Notice of Videotaped Discovery of Dr. Suprith Badarinath (treating physician) for January 11, 2022, attached at Exhibit V; Amended Notice for Videotaped Discovery of Dr. Ehsan Shirazi (treating physician) for January 12, 2022, attached at Exhibit W; Plaintiff's Supplemental Interrogatory to A-I-I dated January 19, 2022, attached as Exhibit X; A-I-I's Response to Supplemental Interrogatory dated February 18, 2022, attached as Exhibit Y; A-I-I's Supplemental Requests for Admissions to Plaintiff dated April 7, 2022, attached Exhibit Z; A-I-I's Second Request for Production of Documents to Plaintiff dated May 6, 2022, attached as Exhibit AA; Plaintiff's Responses to A-I-I's Supplemental Requests for Admissions dated May 9, 2022, attached as Exhibit BB; Plaintiff's Responses to A-I-I's Second Request for Production of Documents dated June 6, 2022, attached as Exhibit CC. A-I-I has made several filings this year to obtain Plaintiff's mother's military records, including issuing an updated subpoena on October 31, 2022, which Plaintiff did not object to as untimely." Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action, *Gref v. Am. Int'l Indus., et al.*, No. 1:20-cv-05589-GBD-VF, EFC No. 259, attached as Exhibit DD.

On October 27, 2022, A-I-I issued the subpoena to PPA and PPA received service on November 7, 2022. Memorandum in Support of Motion to Quash, *In re Subpoena for Documents Issued to Peninsula Pathology Associates*, No. 4:22-mc-0001, EFC No. 1-2. On November 18, 2022, PPA filed its Motion to Quash the Subpoena. *Id.* at CF No. 1-1.

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 45 governs subpoenas to parties or non-parties commanding the production of "designated documents, electronically stored information, or tangible things in that person's possession, custody, or control." Fed. R. Civ. P. 45(a)(1)(A)(iii). Rule 45 permits the same scope of discovery as Rule 26. *See* Fed. R. Civ. P. 45 advisory committee's notes on 1991 Amendment, subdivision (a) ("The non-party witness is subject to the same scope of discovery under this rule as that person would be as a party to whom a request is addressed pursuant to Rule 34," which governs the production of documents requested under Rule 26). Generally, discovery under the Federal Rules of Civil Procedure "is broad in scope and freely permitted." *Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 64 (4th Cir. 1999).

In determining the appropriateness of a subpoena, the Court must balance the requirements of Rule 45 with Rule 26. Rule 26(b) limits the scope of discovery to matters "relevant to any party's claim or defense and proportional to the needs of the case," Fed. R. Civ. P. 26(b)(1), while Rule 45(d)(1) requires that a party seeking discovery through the use of a subpoena "must take reasonable steps to avoid imposing undue burden or expense on a person subjected to the subpoena." Fed. R. Civ. P. 45(d)(1). The burden to establish that a subpoena imposes an undue burden is on the person opposing its command. *See Singletary v. Sterling Transp. Co.*, 289 F.R.D. 237, 241 (E.D. Va. 2012); *Castle v. Jallah*, 142 F.R.D. 618, 620 (E.D. Va. 1992). A court "must quash or modify a subpoena that," as relevant here, "requires disclosure of privileged or other protected matter, if no exception or waiver applies." Fed. R. Civ. P. 45 (d)(3)(A)(iii). A person who objects to production of the subpoenaed information based on a claim that it is privileged bears the burden of proof to expressly make the claim and "describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or projected, will enable the parties to assess the claim." Fed. R. Civ. P.

45(e)(2)(A)(ii). Courts have broad discretion in determining whether a movant has established that predicate. *See Cook v. Howard*, 484 F. App'x 805, 812 (4th Cir. 2012) ("District courts are afforded broad discretion with respect to discovery generally, and motions to quash subpoenas specifically").

## ARGUMENT

### I.      The Subpoena to Peninsula Pathology Associates was Timely Served.

The subpoena to PPA is timely. Discovery is ongoing in the *Gref* case and there is no established trial date. On September 6, 2022, the court in the underlying case adjourned the pretrial conference "until discovery is complete," ordering that **"[o]nce discovery is complete, the parties are to notify the Court."** Ex. S. To-date, the parties have not notified the court that discovery is complete.  As explained above, there are multiple expert depositions and fact discovery issues outstanding. *See* Procedural History. In fact, the subpoena to obtain military records was issued only one week prior to the instant subpoena to PPA.

The majority of jurisdictions recognize that under Rule 45 of the Federal Rules, subpoenas are discovery devices and therefore fall within the general discovery deadlines. *See Draper v. U.S. Postal Serv.*, No. 3:18CV00009, 2018 WL 2423002, at *2 (W.D. Va. May 29, 2018), *aff'd*, 740 F. App'x 315 (4th Cir. 2018) ("subpoenas are discovery devices…"); *Karagiannopoulos v. City of Lowell*, 3:05-CV-401-FDW-DCK, 2008 WL 948261 (W.D.N.C. Apr. 2, 2008). One of the central purposes of enforcing this deadline is to alleviate attempts to reopen discovery on the eve of trial. *Buhrmaster v. Overnite Transp. Co.,* 61 F.3d 461, 464 (6th Cir. 1995). This is not an attempt to "reopen" discovery. Discovery is incomplete and there is no trial date. Indeed, Plaintiff has not objected to other subpoenas filed within a similar timeframe.  The subpoena to PPA is timely and should not be quashed on this basis.

Not only is the subpoena timely because discovery is ongoing in the underlying action, but the subpoena does not violate any scheduling orders of this Court. Notably, all cases cited by PPA relate to the scheduling orders of the court hearing the motions to quash.[6] Numerous district courts have rejected arguments related to timeliness as the third-party subpoenas did not violate any Scheduling Order of the court presiding over the subpoena. *See Somaxon Pharms., Inc. v. Actavis Elizabeth LLC*, No. 22 MISC. 162 (KPF), 2022 WL 3577904, at *3 (S.D.N.Y. Aug. 18, 2022) (rejecting a motion to quash argument related to timeliness because "this Court is not presiding over the case and thus has not issued a scheduling order"). Therefore, the subpoena should not be quashed based on PPA's timeliness argument.

## II.     The Subpoena to Peninsula Pathology Associates Is Highly Relevant and Does Not Present an Undue Burden.

Pursuant to Federal Rule of Civil Procedure 45, parties may use subpoenas to command parties or *non-parties* to "produce designated documents, electronically stored information, or tangible things in that person's possession, custody, or control." Fed. R. Civ. P. 45(a)(1)(A)(iii). Generally, the Federal Rules of Civil Procedure allow for broad discovery. *Deitchman v. E.R. Squibb & Sons, Inc.*, 740 F.2d 556, 559 (7th Cir. 1984). In determining the appropriateness of a

---

[6] *Wantanable Realty Corp. v. City of N.Y.*, 159 Fed. App'x 235, n.2 (2d Cir. 2005) (noting in *dicta* the district court found a subpoena violated its deadline); *McAfee v. Boczar*, No. 3:11CV646, 2012 WL 2505263, at *1 (E.D. Va. June 28, 2012) ("the Scheduling Order entered in *this matter*…") (emphasis added); *Harrison v. Kennedy*, No. 3:18-CV-0057-RMG, 2019 WL 3712187, at *2 (D.S.C. Aug. 7, 2019) ("contravenes *this Court's* Order closing discovery") (emphasis added); *Jefferson v. Biogen IDEC Inc.*, No. 5:11-CV-00237, 2012 WL 1150415, at *2 (E.D.N.C. Apr. 5, 2012) (finding plaintiff lacked standing to challenge subpoena, but finding subpoena violated the Court own Scheduling Order); *FIP Realty Co. v. Ingersoll-Rand PLC*, No. 2:19-CV-3291, 2020 WL 6060412, at *1 (S.D. Ohio Oct. 14, 2020) ("*this Court* set a case schedule…") (emphasis added); *McGuire v. Warner*, No. 05-40185, 2009 WL 2370738, at *2 (E.D. Mich. July 29, 2009) ("violates this Court's Scheduling Order") (emphasis added); *Wachtell v. Cap. One Fin. Corp.*, No. CV 03-267, 2006 WL 8446017, at *6 (D. Idaho May 9, 2006) ("not timely under the Court's Amended Scheduling Order") (emphasis added); *Dag Enterprises, Inc. v. Exxon Mobil Corp.*, 226 F.R.D. 95, 104 (D.D.C. 2005) ("This Court set a firm deadline…") (emphasis added); *Dodson v. CBS Broad., Inc.*, No. 02-CIV-9270(KMW)AJ, 2005 WL 3177723, at *1 (S.D.N.Y. Nov. 29, 2005) (subpoena issued after hearing Court's own Scheduling Order); *Integra Lifesciences I, Ltd. v. Merck KGaA*, 190 F.R.D. 556, 557 (S.D. Cal. 1999) ("Pursuant to this Court's [] Scheduling Order…").

subpoena, the Court must balance the requirements of Rule 45 with Rule 26. Rule 26(b) limits the scope of discovery to matters "relevant to any party's claim or defense and proportional to the needs of the case," Fed. R. Civ. P. 26(b)(1), while Rule 45(d)(1) requires that a party seeking discovery through the use of a subpoena "must take reasonable steps to avoid imposing undue burden or expense on a person subjected to the subpoena." Fed. R. Civ. P. 45(d)(1).

The ultimate question for the Court is whether the benefits of discovery to the requesting party outweigh the burdens on the recipient. *In re Modern Plastics Corp.*, 890 F.3d 244, 251 (6th Cir. 2018); *Citizens Union of N.Y. v. Att'y Gen. of N.Y.*, 269 F. Supp. 3d 124, 138 (S.D.N.Y. 2017). When considering the benefits to the requesting party, "[c]ourts should consider not just the relevance of information sought, but the requesting party's need for it." *See Va. Dep't of Corrections v. Jordan*, 921 F.3d 180, 189 (4th Cir. 2019). "[T]he burden for showing that a subpoena must be quashed under Rule 45([d]) (3) is at all times on the movant." *Ohio Valley Env't Coal., Inc. v. U.S. Army Corps of Eng'rs*, No. 11MC35, 2012 WL 112325, at *2 (N.D.W.Va. Jan. 12, 2012); *see Sheet Metal Workers Int'l Ass'n v. Sweeney*, 29 F.3d 120, 125 (4th Cir. 1994).

      a.   <u>The Requested Information is Highly Relevant.</u>

Here, PPA's Motion to Quash fails to demonstrate that the highly relevant information sought by A-I-I's subpoena, critical to its defense and obtainable only from PPA, is outweighed by any perceived burden on PPA. A-I-I's subpoena seeks relevant, critical information relating to Emory (2020) and its underlying data, financial records related to Dr. Emory's earnings at PPA from medical-legal consulting, and to Plaintiff, specifically. This information is necessary to evaluate the accuracy and credibility of the article upon which Plaintiff's medical experts, Dr. Moline and Dr. Finkelstein, rely to support their ultimate conclusion that cosmetic talc caused Plaintiff's peritoneal mesothelioma.

Whether cosmetic talc causes mesothelioma is a critical issue in the *Gref* case. There are no epidemiological studies demonstrating an increased risk of mesothelioma from cosmetic talc. However, the central premise of Emory (2020) is that cosmetic talc caused more than 100 mesotheliomas in the study subjects (i.e., plaintiffs) combined with those in Moline (2020), which is relied on by the experts in the underlying case. Ex. E. All of the "study subjects" were plaintiffs in underlying litigation. *Id.* Information that discredits the assumption that the study subjects were exposed only to cosmetic talc or inflates the total number of mesothelioma cases is highly relevant to A-I-I's defense.

The subpoena requests are far from a fishing expedition, but rather grounded in legitimate concerns. As stated above, Dr. Maddox, co-author of Emory (2020), concedes that there is possible overlap in cases between the two articles. Ex. B at p. 183-186. And, at least one Plaintiff from Moline (2020) swore under penalty of perjury to exposures other than to cosmetic talc, a fact not disclosed in the article itself. *See* Ex. J; Ex. K at *5.

A-I-I is entitled to discovery which would (i) prevent Plaintiff from misrepresenting to the Court and the jury the results of a study supporting the central claim in this case; and (ii) allow for cross-examination of plaintiff's experts on the data underling their opinions. The *Bell* Court, addressing the credibility concern in Moline (2020) stated:

> From this court's perspective, *inquiry into the accuracy of facts and assumptions underlying scientific merit is not only an appropriate inquiry, but also necessary and required.* "The inquiry envisioned by [Federal] Rule [of Evidence] 702 is . . . a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability-of the principles that underlie a proposed submission." *Daubert*, 509 U.S. at 594-95. Even if reliability is examined by a court and deemed sufficient to support admissibility, relevant cross-examination of an expert includes "factual underpinnings [which] . . . affect the weight and credibility of the witness' assessment." *Bresler v. Wilmington Tr. Co.*, 855 F.3d 178, 195 (4th Cir. 2017) (internal quotation mark omitted) (quoting

> *Structural Polymer Grp. v. Zoltek Corp.*, 543 F.3d 987, 997 (8th Cir.
> 2008)).

Ex. K at p. *7 (emphasis added); *see also Deitchman*, 740 F.2d at 563 (in which the Seventh Circuit

ruled that access to research data underlying published literature "universally [] relied upon by

plaintiff's experts in DES litigation" was "absolutely essential" for the defendant to "prepare

properly a defense on the causation issue.").

Here, the denial of discovery would preclude A-I-I from "engaging in any meaningful

cross-examination of plaintiffs' experts' opinions" based on Emory (2020). *See id.* at 561-62

(citations omitted) ("Cross-examination is a fundamental right that a court should abridge only to

curb abuse); *see also Reilly v. Pinkus*, 338 U.S. 269, 275 (1949) ("Although the scope of cross-

examination is left to the discretion of the trial judge, where the circumstances are such that a

restriction on cross-examination is so severe as to constitute a denial of the right, the particular

restriction in question may constitute an abuse of discretion.").  Therefore, discovery related to the

facts, assumptions, and credibility of Emory (2020) is highly relevant and necessary to A-I-I's

defense.

      b.  <u>The Requested Information is not Available from Other Sources.</u>

The information sought in A-I-I's subpoena is not available from other sources.

> Courts should also consider what information is available to the
> requesting party from other sources...To that end, the requesting
> party should be able to explain why it cannot obtain the same
> information, or comparable information that would also satisfy its
> needs, from one of the parties to the litigation—or, in appropriate
> cases, from other third parties that would be more logical targets for
> the subpoena.

*Jordan*, 921 F.3d at 189; *Amini Innovation Corp. v. McFerran Home Furnishings, Inc.*, 300 F.R.D.

406, 409-10 (C.D. Cal. 2014). The requested documents are directly related to Dr. Emory's

medical-legal consultation work through PPA, and PPA has not presented a more appropriate target for this subpoena.

In fact, Emory (2020) states that any correspondence related to the article should be directed to Dr. Emory at PPA. Ex. E. Dr. Maddox has also described Dr. Emory as the "central fulcrum" of the article. Ex. B at p. 154, 178. Yet, she has repeatedly refused to provide any further identifying information regarding these litigation cases to defense attorneys. Depo. of Dr. Emory in *Bell v. American International Industries, Inc. et al*, taken on Oct. 1, 2020, at p. 153-156, 158-159, attached as Exhibit EE. Therefore, this information is not available from other sources, and a subpoena to PPA is entirely appropriate and necessary.

   c.   <u>PPA Fails to Establish that the Requests are Unduly Burdensome.</u>

To prevail on the grounds of burdensomeness, the objecting party must do more to carry its burden than make conclusory and unsubstantiated arguments. *See, e.g.*, *Convertino v. U.S. Dep't of Justice*, 565 F. Supp. 2d 10, 14 (D.D.C. 2008) ("This Court 'only entertains an unduly burdensome objection when the responding party demonstrates how [discovery of] the document is 'overly broad, burdensome, or oppressive, by submitting affidavits or offering evidence which reveals the nature of the burden."); *Cory v. Aztec Steel Bldg., Inc*., 225 F.R.D. 667, 672 (D. Kan. 2005) (finding that the party opposing discovery on the ground of burdensomeness must submit detailed facts regarding the anticipated time and expense involved in responding to the discovery which justifies the objection).

PPA makes only conclusory statements that the subpoena is overly broad and unduly burdensome yet fails to provide any relevant support for its claims. As a threshold issue, PPA's assertion that it "had nothing to do with the Article" misrepresents its relationship with Dr. Emory and the underlying patients in Emory (2020). Dr. Emory and Dr. Maddox are part of PPA, and the

majority of cases in Emory (2020) were medical-legal consultations reviewed by Dr. Emory and Dr. Maddox for which PPA received money. Ex. B at p. 146. For purposes of the subpoena, PPA cannot fairly disclaim any connection to the Article or the underlying data.

Moreover, the fact that neither Dr. Emory nor any other member of PPA has been retained as an expert in the *Gref* case is not dispositive.[7]  As PPA concedes, non-party or non-fact witness status is one of numerous factors courts may consider when weighing burdensomeness versus relevance. *See* Memorandum in Support of Motion to Quash, *In re Subpoena for Documents Issued to Peninsula Pathology Associates*, No. 4:22-mc-0001, EFC Nos. 1-1, at p. 11. Here, PPA's status as a "non-party" should not be given "special weight." The Fourth Circuit, in discussing non-party subpoenas, considered that non-parties are "strangers to litigation." *See Jordan*, 921 F.3d at 188. That is not applicable to PPA, which has provided litigation consulting services throughout the country and has been around for decades. Depo of Dr. Maddox in *Archdeacon v. Ameron International Corp., et al.,* taken on August 6, 2015 at p. 43, attached as Exhibit FF. Moreover, the *Jordan* court noted that "bystanders should not be drawn into the parties' dispute without some good reason." *Jordan*, 921 F.3d at 188. The benefits of this discovery to A-I-I's proper defense of the underlying case satisfies this bar.

PPA's Motion does not explain how production of the requested documents would be intrusive or unduly burdensome, except to argue that production "risks chilling participation in beneficial public research." *See* Memorandum in Support of Motion to Quash, *In re Subpoena for Documents Issued to Peninsula Pathology Associates*, No. 4:22-mc-0001, EFC Nos. 1-1, at p. 11-12. But, as discussed further below, the authors of Emory (2020) compiled the cases from litigation consulting and did not obtain consent from the underlying plaintiffs. PPA's argument is

---

[7] PPA does not state in its Motion that Mr. Gref was not included as one of their litigation cases reported in Emory (2020).

inapplicable. *See* Section III(A)(i)-(iii). The subjects of the study (i.e., plaintiffs) were not chosen for inclusion in Emory (2020) based on their desire to participate; rather, these subjects were chosen by the authors *after* the subjects' decisions to make their health conditions public by filing lawsuits and then hiring the authors of Emory (2020) to act as experts on their behalf in these lawsuits.

For these reasons, PPA has not met its burden to show that the highly relevant information sought by A-I-I and only available from PPA imposes an undue burden.

### III.    The Subpoenaed Materials Are Not Protected.

Under Rule 45, if subpoenaed information is withheld under a claim that it is privileged or subject to protection as trial-preparation material, then the subpoenaed party must:

(1) Expressly make the claim; and
(2) Describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

Fed. R. Civ. P. 45(e)(2)(A)(i)-(ii) (2023). The Advisory Committee Notes state that Rule 45(c)(3)(B)(i), "corresponds to Rule 26(c)." *See* Fed. R. Civ. P. 45 advisory committee's notes on 1991 Amendment; *see also Insulate Am. v. Masco Corp.,* 227 F.R.D. 427, 432 (W.D.N.C. 2005) ("A non-party...may seek from the court protection from discovery by the overlapping and interrelated provisions of Rules 26 and 45...."). Rule 26(c) allows courts to issue an order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense....". Fed. R. Civ. P. 26(c). In analyzing motions for a protective order, courts weigh the need of the party seeking the discovery against any undue hardships created by permitting it. *See In re Initial Pub. Offering Sec. Litig.,* 220 F.R.D. 30, 36 (S.D.N.Y. 2003); *Apex Oil Co. v. DiMauro,* 110 F.R.D. 490, 496 (S.D.N.Y. 1985). Because relevant evidence carries a presumption

of admissibility, the burden of proof for a Rule 26(c) order rests with the party seeking protection. *See Condit v. Dunne,* 225 F.R.D. 100, 106 (S.D.N.Y. 2004). If the court finds that that undue hardship outweighs necessity, courts have discretion in deciding what form of protection to grant and it may either quash the subpoena or enforce it on limited terms or with other conditions. *See* Fed. R. Civ. P. 26(c); *Am. High–Income Trust v. AlliedSignal Inc.,* No. 02 CIV 2506 LTS JFC, 2006 WL 3545432, at *2 (S.D.N.Y. Dec. 8, 2006); *Deitchman v. E.R. Squibb & Sons, Inc.,* 740 F.2d 556, 564 (7th Cir.1984) (finding that defendant was entitled to limited discovery despite need to protect certain requested material) (discussed *supra* in footnote 9).

Here, the elements of undue hardship and necessity are analyzed *infra* in Section II and will not be repeated. As outlined below, the protections afforded to research data do not apply to the litigation cases reported in Emory (2020). Even assuming these protections applied, PPA did not create the required privilege log so that the Court and the parties can assess the protections and therefore waived any alleged protections. Fed. R. Civ. P. 45(e)(2)(A)(ii). PPA failed to meet its burden by making conclusory, blanket assertions of privilege, which are insufficient to quash the subpoena.

    a.   The Litigation Cases Reported in Emory (2020) are not Protected Materials.

The data PPA seeks to "protect" was obtained from plaintiffs' lawyers and contained in Dr. Emory, Dr. Maddox, and Dr. Kradin's litigation reports and files as part of their work as expert witnesses in those cases. Exhibit E; Ex. B at p. 146, 157, 163-165. All 75 subjects publicly placed their medical condition at issue by filing lawsuits. None of the authors, including Dr. Emory, have a physician-patient relationship with the plaintiffs and the underlying data was not obtained by virtue of clinical responsibilities through treatment of the plaintiffs. Instead, PPA, Dr. Emory, and Dr. Maddox (i) profited handsomely from medical-legal consulting; (ii) used their expert reports

generated for plaintiffs' attorneys to write an article to support their litigation-driven opinions, and (iii) now seek to prevent discovery of their litigation-based paper with a meritless confidentiality claim.

Although difficult to navigate, PPA appears to argue circularly that because the subpoenaed materials are "highly sensitive and protected information," the materials are protected.[8] Memorandum in Support of Motion to Quash, *In re Subpoena for Documents Issued to Peninsula Pathology Associates*, No. 4:22-mc-0001, EFC Nos. 1-1, at p. 15. It incorrectly asserts that these protections attach to the subpoenaed materials because: (i) the Department of Health and Human Services (HHS) and the Food and Drug Administration (FDA) regulations require that the subjects be anonymized; (ii) confidentiality and patient privacy are essential to the ability of researchers to obtain data and revelation of the data impedes this research; and (iii) it violates the Health Insurance Portability and Accountability Act ("HIPAA"). *Id.* at p. 16-18. As explained below, PPA does not meet its burden of establishing that any protections apply to the litigation cases and the subpoenaed information should be produced.

> i. *Federal regulations do not apply to the litigation cases reported in Emory (2020).*

In her affidavit, Dr. Emory asserts that the HHS and FDA regulations require that subjects be anonymized. Memorandum in Support of Motion to Quash, *In re Subpoena for Documents Issued to Peninsula Pathology Associates*, No. 4:22-mc-0001, EFC No. 1-2, at p. 3. Notwithstanding the lack of a citation, it appears that PPA is attempting to invoke the Federal Policy for the Protection of Human Subjects ("Common Rule"). 45 C.F.R. 46(A). These

---

[8] In this section, PPA also meanderingly contends that the subpoena was incorrectly direct to PPA instead of Dr. Emory, that the subpoena was untimely, that PPA does not have any relationship with the underlying litigation, and that the data requested is not relevant. Each of these issues is discussed elsewhere in this Opposition and will not be repeated here.

regulations apply to "all research involving human subjects conducted, supported, or otherwise subject to regulation by any Federal department or agency…" and confer certain consent requirements and confidentiality protections upon "human subject" research that can be enforced by an Institutional Review Board ("IRB"). 45 C.F.R. 46(A) §46.101(a) (2020).

In Bell, the district court rejected the application of the "Common Rule" when deciding to unseal select identifying information reported in Moline (2020). Ex. K at n. 8. When discussing the Common Rule, the court in *Bell* explained that:

> [Dr. Moline's employer] appears to concede that because Dr. Moline's study was not conducted by or on behalf of the federal government these protections for human subjects do not inherently apply…Rather, [the employer] insists the protections apply because it has voluntarily elected…to have these protections apply to all its human subject research – regardless of the source of support or funding for that research. [The employer's] concession that these protections only apply because it has chosen to apply them…suggests to this court that these protections are not requirements imposed on [the employer] by the government, but rather requirements it has imposed upon itself. Thus, nonenforcement of these protections would not seem to violate any federal requirements that the government itself has imposed on [the employer].

*Id.* (internal citations omitted).

Emory (2020) does not disclose that the research was conducted by or on behalf of the federal government. Ex. E. It does not report any funding sources, including funding or support from the federal government. *Id.* In their affidavits, both Dr. Emory and Dr. Maddox detail that they did not receive any compensation for their roles as co-authors.[9] Memorandum in Support of Motion to Quash, *In re Subpoena for Documents Issued to Peninsula Pathology Associates*, No. 4:22-mc-0001, EFC Nos. 1-2, at p. 2-3, 1-3, at p. 3. Further, Emory (2020) does not detail that it

---

[9] While Dr. Emory and Dr. Maddox did not receive compensation for drafting the article, they (PPA) were of course compensated for their initial reviews of the litigation cases by plaintiffs' attorneys and PPA continues to reap the benefits from the publication of the article from ongoing medical-legal consulting.

received IRB approval from PPA or any other institution. Ex. E **XX**. *See also* Ex. B at p. 167

(testifying that IRB approval was not required). In fact, the article specifically notes that because

"these cases were selected from medical-legal consultation practice and no identifying information

was included, there was no formal institutional consent nor informed consent required." *Id.* at p.

489. Therefore, as explained in *Bell*, the protections for human subjects outlined in the federal

regulations do not apply to the litigation cases reported in Emory (2020).

> ii. *Disclosure of the Litigation Cases Reported in Emory (2020) does not Create a Chilling Effect on Future Research.*

The data used in Emory (2020) was wholly derived from litigation cases, where the

plaintiffs placed their identities, medical conditions, exposures, and other personal information at

issue in the public sphere, with no expectation of confidentiality. Ex. E. Although courts recognize

that confidentiality can be essential to the ability of researchers to obtain data,[10] it was not essential

to the collection and use of data in Emory (2020). *See Andrews v. E.R. Squibb & Sons, Inc.,* 97

F.R.D. 494, 499 (N.D. Ill. 1983) (internal citations omitted) (weighing privacy considerations and

---

[10] PPA relies on numerous distinguishable cases to support this confidentiality argument. For example, in *Andrews*, the district court limited the disclosure of certain confidential information in part because the participants were promised that all information received would be kept confidential. *Andrews v. E.R. Squibb & Sons, Inc.,* 97 F.R.D. 494, 496, 499 (N.D. Ill. 1983), *vacated, Deitchman v. E.R. Squibb & Sons, Inc.,* 740 F.2d 556 (7th Cir. 1984) (holding that defendant drug company was entitled to some discovery of data gathered by the study). Further, the district court cited to federal regulations protecting confidential data of human subjects after receipt of federal funding and a state statute protecting the data as "strictly confidential." *Andrews,* at 499. Notably, the district court ordered production of records related to any participants of the study who had brought actions against the defendant. *Id.* at p. 504. The district court held that disclosure of plaintiffs' medical records was not confidential because the records had been produced in the underlying litigation. *Id.*; *see also Lampshire v. Proctor & Gamble Co.,* 94 F.R.D. 58 (N.D. Ga. 1982) (permitting disclosure of data with redactions of identifying personal information, but not addressing whether a privilege applies), *aff'd, Farnsworth v. Proctor & Gamble Co.,* 758 F.2d 1545, 1547-48 (11th Cir. 1985) (noting that defendant was provided with "an enormous quantity" of information regarding the research and that every single document requested was delivered, with the sole deletion to the names and addresses of the participants); *Doe v. Am. Red Cross Blood Servs., S.C. Region,* 125 F.R.D. 646, 653 (D.S.C. 1989) (denying the motion to compel the identity of a blood donor whose blood was transfused to plaintiff because the donor was assured that their identity and medical history would remain confidential and society's interest in maintaining an adequate and safe supply of volunteer blood outweighed plaintiffs' interests in questioning of the donor) (superseded by regulation); *In re Fosamax Prods. Liab. Litig.,* No. 06-MD-1789JFKCF, 2009 WL 2395899, at *5 (S.D.N.Y. Aug. 4, 2009) (noting that the subpoena presents an undue burden that outweighs the necessity of testimony due in part to assurances to participations that their research and reviews are confidential).

permitting disclosure of certain medical information because (in part) it had been previously produced in the underlying litigation) (discussed further *infra* in footnote 9).

In *Bell*, the court dismissed the argument that disclosure of the identities of research subjects in Moline (2020) would significantly dissuade individuals from agreeing to participate in human subject research. Ex. K at p. *11. Specifically, the court held that the cases reported in Moline (2020) never agreed to participate in Dr. Moline's research because consent from the subjects was not required. *Id.* The court further emphasized that the requested disclosure of identifying information (i.e., plaintiff's name, brands of talc used, the name of the law firm representing plaintiff, and plaintiff's occupation and diagnosis date) is already publicly available through litigation filings. *Id.* at *11-*12. Consequently, the court concluded that Dr. Moline's employer no longer had a remaining privacy interest in the identifying information of the select case because "the interest in confidentiality belongs primarily to the study participant, not the researcher or the sponsoring facility." *Id.* at *12.

In the instant case, PPA argues that compelling discovery from a "third party researcher risks chilling participation in beneficial public research." Memorandum in Support of Motion to Quash, *In re Subpoena for Documents Issued to Peninsula Pathology Associates*, No. 4:22-mc-0001, EFC Nos. 1-1, at p. 16 (internal citations omitted). Like *Bell*, the litigation cases reported in Emory (2020) did not consent to participation in the study. Ex. E at p. 489 ("no informed consent [was] required" from the medical-legal cases). Therefore, the contention that the subpoena in this action chills participation in research is substantially diminished, if not eliminated.

PPA further contends that disclosure of the 75 subjects have *never* been revealed and it would be inappropriate to require such disclosure in *any* context. Memorandum in Support of Motion to Quash, *In re Subpoena for Documents Issued to Peninsula Pathology Associates*, No.

4:22-mc-0001, EFC Nos. 1-1, at p. 15 (emphasis added). While it is true that Dr. Emory may hold the key to identify the litigation cases reported in Emory (2020), it is inaccurate to argue that the identities have never been revealed. Ex. B at p. 154, 178. Indeed, the identities and all of the other relevant data for the 75 litigation cases was obtained from plaintiffs' lawyers and contained in Dr. Emory, Dr. Maddox, and Dr. Kradin's litigation reports and files as part of their work as expert witnesses in these cases. Exhibit E; Ex. B at p. 146, 157, 163-165. Although PPA stringently objects to the disclosure of any information related to these litigation cases in any context and Dr. Emory refuses to provide any identifying information to defense counsel, she has freely provided information about one of the reported cases with another prominent plaintiff's expert. Ex. EE at p. 180-181. PPA's position is a baseless litigation tactic to stonewall the production of underlying data that would allow for meaningful cross-examination of experts in this case, as well as cases pending throughout the nation.

> iii.  *HIPAA does not apply to the health information disclosed in the course of litigation and employed in Emory (2020).*

Contrary to PPA's position, HIPAA does not prohibit the disclosure of the health information of the litigation cases reported in Emory (2020). HIPAA regulates the release of "protected health information" by specific "covered entities," which include health plans, health care clearinghouses, and certain health care providers. 45 C.F.R. § 160.103. "Covered entities" do not include plaintiffs' experts in personal injury actions or their medical-legal consulting groups.

In all of the litigation cases reported in Emory (2020), the plaintiffs placed their medical conditions at issue, typically claiming that their diseases were caused by asbestos exposure. The various plaintiffs issued written authorizations releasing their health information from their health care providers (i.e., the covered entities) to attorneys in litigation. The majority of this health information was, in turn, provided to PPA by virtue of Dr. Emory and Dr. Maddox's roles as

plaintiffs' experts in cases across the country and later used to publish Emory (2020). After using this information for their benefit and without the plaintiffs' consent, PPA and Dr. Emory cannot now use HIPAA as a shield to produce health information that is unprotected by the act.  Simply put, HIPAA does not prohibit the release of data properly obtained from a covered entity during the course of litigation to A-I-I in the instant action.

PPA has failed to meet its burden of establishing that protections apply to the litigation cases reported in Emory (2020). Further, as explained *infra*, the necessity of production of the subpoenaed materials outweighs PPA's wholesale assertions of undue hardship. As such, the Court should compel production of the documents and deny PPA's request to quash the subpoena on these grounds.

b.   Even if Research Protections Apply, PPA did not Produce the Required Privilege Log under Rule 45 of the Federal Rules of Civil Procedure and Waived Any Alleged Protections.

Rule 45 of the Federal Rules of Civil Procedure mandates that if a party asserts that subpoenaed materials are protected, then it must "describe the nature of the withheld information...in a manner that, without revealing information itself...protected, will enable the parties to assess the claim." Fed. R. Civ. P. 45(e)(2)(A)(ii). *See Avery Dennison Corp. v. Four Pillars*, 190 F.R.D. 1, 1 (D.D.C. 1999) (describing privilege logs as "the universally accepted means" of asserting privilege claims in the federal courts). As explained in the Advisory Committee's note, "a person claiming a...protection who fails to provide adequate information about the...protection claim to the party seeking the information is subject to an order to show cause why the person should not be held in contempt under" *See* Fed. R. Civ. P. 45 advisory committee's notes on 1991 Amendment. Further, courts have concluded that failure to submit a privilege log is deemed to waive the underlying privilege claim. *In re Grand Jury Subpoena*, 274

F.3d 563, 576 (1st Cir. 2001); *Dorf & Stanton Commc'ns., Inc. v. Molson Breweries*, 100 F.3d 919, 923 (Fed. Cir. 1996) (affirming the district court's determination that privilege had been waived because the party asserting the privilege failed to comply with Rule 45).

Here, PPA failed to produce the required privilege log. Instead, it asserted blanket protections to the litigation cases reported in Emory (2020) that do not allow the Court nor the parties to assess the veracity or applicability of these alleged protections. This failure is fatal, and any asserted protections are waived. The motion to quash the subpoena should be denied and PPA should be compelled to produce the subpoenaed materials.[11]

## IV.   There Is No Basis for Attorneys' Fees or Sanctions Against A-I-I.

Because A-I-I's subpoena does not impose undue burden or expense on PPA, there is no basis for sanctions. As detailed in Section II above, PPA does not carry its burden to prove undue burden, particularly in light of "the relevance of the material sought." *Breaking Media, Inc. v. Jowers*, No. 21-MISC- 194 (KRF), 2021 WL 1299108, at *7 (S.D.N.Y. Apr. 7, 2021). Specifically, PPA fails to demonstrate how the requested information is untimely, irrelevant, harassing, or protected from disclosure, as asserted in its Motion. *See supra* Sections I, II, III. Based on PPA's failure to satisfy the first prong of the inquiry, that the subpoena imposes an undue burden, the Court need not evaluate the second step of the inquiry (whether A-I-I took "reasonable steps" to avoid imposing an undue burden).

Assuming *arguendo* that PPA meets the first step of the inquiry, A-I-I took reasonable steps to avoid imposing an undue burden. A-I-I acted in good faith[12], issued its subpoena while

[11] A-I-I asserts that PPA does not have any protections under Rule 45, and if it does, the protections have been waived. However, if the Court finds otherwise, A-I-I requests that at a minimum, a privilege log be produced to allow it and the Court the opportunity assess the veracity of the alleged protections.

[12] While this Court has the inherent power to impose sanctions on a party, "[g]enerally the Court must find that the party acted in 'bad faith' before the Court invokes its inherent powers." *Am. Sci. & Eng'g, Inc. v. Autoclear, LLC*, 606 F. Supp. 2d 617, 620 (E.D. Va. 2008) (citing *Chambers v. NASCO Inc.*, 501 U.S. 32, 111 S. Ct. 2123 (1994)). PPA does not allege that A-I-I acted in bad faith.

discovery is ongoing in the underlying case, and tailored the subpoena to requests likely to lead to the discovery of relevant and necessary documents to defend the claims against it. Accordingly, this Court should deny PPA's request for an award of attorney's fees and sanctions.

## **CONCLUSION**

Peninsula Pathology Associates (PPA) (i) profit handsomely from medical-legal consulting; (ii) used expert litigation reports generated for plaintiffs' attorneys to write an article to support litigation-driven opinions; and (iii) now seek to prevent discovery of their litigation-based paper with meritless confidentiality claims. A-I-I's subpoena was timely, does not impose an undue burden on PPA, and seeks to obtain non-privileged data derived from the litigation cases underlying the Emory (2020) article. As such, PPA's Motion to Quash should be denied.

Date:  December 2, 2022

AMERICAN INTERNATIONAL INDUSTRIES

By: */s/ Eric D. Cook*

Eric D. Cook (VSB #68054)
WILLCOX SAVAGE, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, Virginia 23150
Telephone:  (757) 628-5500
Facsimile:  (757) 628-5566
*Counsel for Defendant American International Industries*

And


By:  */s/ Robert E. Thackston*

Robert E. Thackston (VSB #27385)
**LATHROP GPM LLP**
2101 Cedar Springs Road, Suite 1400
Dallas, TX 75201-2134
Telephone: 469.983.6100
robert.thackston@lathropgpm.com
*Counsel for Defendant American International Industries*


## CERTIFICATE OF SERVICE


I hereby certify that on this 2nd day of December, 2022, I electronically filed the ***American International Industries' Response in Opposition to Peninsula Pathology Associates' Motion to Quash*** with the Clerk of the Court using the CM/ECF system, which will notify all counsel of record of this filing. My co-counsel will concurrently serve all counsel of record in the underlying matter, *Gref v. American International Industries*, USDC-SDNY Case No. 1:20-cv-05589.


By:  */s/ Eric D. Cook*

Of Counsel


Eric D. Cook, Esq. (VSB#68054)
Willcox Savage, P.C.
440 Monticello Avenue, Suite 2200
Norfolk, VA  23510
Telephone:    (757) 628-5500
Facsimile:     (757) 628-5566
ecook@wilsav.com
*Counsel for American International Industries*