# Exhibit 4

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
CASE NO:  1:20-cv-05589-GBD-DCF

---------------------------------------------------------x
BRIAN JOSEPH GREF,                                       )
                         Plaintiff                       )
                                                         )
            -versus-                                     )
                                                         )
AMERICAN INTERNATIONAL INDUSTRIES, individually and      )
as successor-in-interest for the CLUBMAN BRAND, and      )
To THE NESLEMUR COMPANY and PINAUD COMPANY, et al.,      )
                         Defendants.                     )
---------------------------------------------------------x

TRANSCRIPT of the Virtual Videotaped Deposition of the witness, JACQUELINE MOLINE, MD, taken  by Defendant, called for Oral Examination in the above-captioned matter, said deposition being taken pursuant to Federal Rules of Civil Procedure by and before,  ELEANOR SEKULIC, a Notary Public on Wednesday, July 6, 2022, commencing at 11:16 a.m.

PRIORITY-ONE COURT REPORTING, INC.
290 West Mount Pleasant Avenue, Suite 2260
Livingston, New Jersey  07039
(718) 983-1234

Job Number:  5276089

Page 138

Jacqueline Moline, MD - Direct

1 
2  Q. Okay. The rest of it is the title of paper.
3     Is that what I left out?
4          MR. DIMUZIO: Objection to form.
5  A. And when it was published and where it was
6     published, but, yes.
7  Q. Okay.
8     So let's go through the steps real quick, if
9     we can. The first step is, was the person exposed
10    to a toxin? And, for you, the toxin would be
11    whatever the carcinogenic agent would be, right?
12 A. Correct.
13 Q. And --
14 A. Or -- no, it doesn't have to be -- it doesn't
15    have to be carcinogen. It's a toxin. Someone could
16    develop liver fibrosis if they're exposed to a toxic
17    agent. So it doesn't say carcinogen anywhere there.
18 Q. So it doesn't need to be a carcinogen to be
19    here? Or no? When we're talking about Mr. Gref and
20    your opinion in this case, does it have to be a
21    carcinogen?
22         MR. DIMUZIO: Objection. Form.
23    Vague and ambiguous.
24 A. Well, in this particular instance I'm talking
25    about asbestos, which is a carcinogen. But my point

Page 139

Jacqueline Moline, MD - Direct

1
2     is, this is a methodology that can be used for
3     non-carcinogenic toxins or toxicants as well. And
4     it doesn't say was the individual exposed to a
5     carcinogen? It says were they exposed to a toxic
6     agent? Not all toxicities are cancers. That was my
7     point.
8  Q. Okay.
9  A. You were inferring something that is not
10    stated in the words on the page.
11 Q. I just wanted to know if you believe that in
12    order to be a toxin, for purposes of this case, it
13    has to be carcinogenic?
14         MR. DIMUZIO: Objection. Form.
15    Vague and ambiguous. And asked and answered.
16 A. For the purpose of this case, we're talking
17    about asbestos in mesothelioma. Mesothelioma is a
18    cancer. So, in this particular instance, the toxin
19    has to be carcinogenic but it doesn't imply that
20    this methodology can only be used for a carcinogen.
21 Q. All right.
22    Step 2, does the toxin cause the disease that
23    the person has? And then the cancer that the person
24    has in this instance is peritoneal mesothelioma; is
25    that right?

Page 140

Jacqueline Moline, MD - Direct

1
2  A. Correct.
3  Q. You indicate that there's no dispute in the
4     medical literature but you don't cite any particular
5     medical literature. Is there any particular medical
6     literature that you would cite with respect to
7     peritoneal mesothelioma?
8  A. I mean, I talked about Kradin, I talked about
9     the Welch paper. I can point you to occupational
10    medicine textbooks by Rohm and others. And it's
11    widely accepted in the occupational and
12    environmental literature that mesothelioma, both
13    peritoneal and pleura, as well as in CDC documents
14    and -- it's just widely accepted.
15 Q. All right.
16    Number 3, was the person exposed to the toxin
17    at a level where the injury has occurred in other
18    settings? And then you mention that there's
19    analogous exposure scenarios, your phrase. And then
20    you reference Footnote 2 on the bottom of 21. Let
21    me get to it. That references a number of different
22    articles and studies. Do you see that on the bottom
23    of Page 21?
24 A. Yes.
25 Q. And that's what you're talking about, those

Page 141

Jacqueline Moline, MD - Direct

1
2     references in Footnote 2 that are "analogous
3     exposure scenarios"?
4  A. With respect to talc, yes.
5  Q. All right.
6     So, for any of those listed, and you have
7     there -- first of all, "recently" -- you say in the
8     body of Page 21, "As described above and recently
9     referenced by the Centers For Disease Control, as
10    well as the published -- as well as published in
11    peer reviewed literature." "Referenced by the
12    Centers for Disease Control," what's that reference
13    to? Is that the 2017 Mazurek?
14 A. Yes.
15 Q. That is, okay.
16    So, and then, in Footnote 2 there you mention
17    '94 Andrion, A-N-D-R-I-O-N, a number of different --
18    the 1992 Bulbulyan, B-U-L-B-U-L-Y-A-N, 2012
19    Finkelstein, 2001 Ghio, G-H-I-O, the 2005 Fujiwara,
20    F-U-J-I-W-A-R-A, 2015 Ilgren, 1988 Lamb, 2017
21    Mirabelli, M-I-R-A-B-E-L-L-I, the 2009 Musti,
22    M-U-S-T-I, 2020 Dr. Moline, and 2020 Emory. Those
23    you're saying are analogous exposure scenarios,
24    right?
25         MR. DIMUZIO: Objection. Form.

36 (Pages 138 - 141)

Page 142

Jacqueline Moline, MD - Direct

2  A.  In the sense that they were mesotheliomas
3      which arose after exposure to talc.
4  Q.  Okay.
5      Which one of those are, if we can just narrow
6      it down, are peritoneal mesotheliomas?
7  A.  Well, Andrion says it in the title. I don't
8      remember whether Bulbulyan was pleural or
9      peritoneal. The pleurodesis was talking about
10     pleural effusions. Fujiwara is talking about
11     pericardial. I don't think Ilgren specified. Lamb,
12     I believe it was a pleural. Mirabelli, I believe it
13     was a pleural. Musti, I believe it was a
14     peritoneal, in the paper that I cited, it was both
15     pleural and peritoneal, as was Emory both pleural
16     and peritoneal.
17 Q.  All right.
18     The Andrion was a case report based on a
19     mother's description to the author, right, a single
20     case?
21 A.  Correct.
22 Q.  And we don't have any information as to the
23     type of product he says he used, or the mother says
24     he used?
25 A.  Correct.

Page 143

Jacqueline Moline, MD - Direct

2  Q.  And there's no specific cumulative dose or
3      product specific dose as to the particular
4      individual in the Andrion study?
5  A.  Correct.
6  Q.  And the same would go for Musti, there's no
7      particular cumulative dose specified or product
8      specific dose or information about a product that we
9      could investigate or look into, right?
10     MR. DIMUZIO: Objection. Form.
11 A.  Not that I'm aware.
12 Q.  And with respect to your case series and Dr.
13     Emory's case series, is there anything that you can
14     provide us with that would allow us to compare
15     either the cumulative doses of those individuals for
16     their lifetime for all sources or any product
17     specific dose for any of those individuals?
18     MR. DIMUZIO: Objection. Form.
19 A.  In would be in the paper I wrote, it just has
20     the number of years of exposure and the different
21     products they used. In terms of Emory, I don't
22     remember if they specified the products.
23 Q.  I'm sorry. Were you finished? I'm sorry.
24 A.  Yes.
25 Q.  But there's no specific data that we can look

Page 144

Jacqueline Moline, MD - Direct

2      at to compare their lifetime cumulative asbestos
3      exposure from all sources of any the individuals
4      that you reported on in your article, right?
5      MR. DIMUZIO: Objection. Form.
6      And asked and answered.
7  A.  There's the number of years that they used
8      talcum powders. That's it.
9  Q.  That's not what I'm asking. I'm trying to
10     understand if we know if they are -- if we have
11     information that we can look at to show what else
12     they could have -- I'm sorry -- what actual asbestos
13     exposures they could have had during their lifetime
14     if they had asbestos-related cancers?
15 A.  There's nothing specified in my paper or in
16     Emory's that would allow you to do that.
17 Q.  And there's nothing in either of those two
18     papers that would allow us to compare and contrast
19     what Mr. Gref says or claims he used versus what any
20     of the individuals that are summarized in either of
21     your two articles or reports, right, there's nothing
22     that we can look at to compare exposure claims?
23     MR. DIMUZIO: Objection. Form.
24 A.  You could look at the different -- the years
25     of use, and you could look at the latency, and you

Page 145

Jacqueline Moline, MD - Direct

2      could look at the location and the different brands
3      in my paper. I can't speak to Emory.
4  Q.  Well, we can't look at anything that would
5      estimate or attempt to estimate the alleged product
6      contents or the dose of any particular individual
7      and then compare it against Mr. Gref, right?
8      MR. DIMUZIO: Objection. Form.
9  A.  That wasn't the purpose of the paper. I don't
10     know how you would do that. I don't know how you do
11     that in any paper, actually.
12 Q.  Okay.
13     So step four is whether other explanations for
14     the condition have been excluded. Why is that step
15     important?
16 A.  Again, because this was a general causation,
17     you look to see if there could be other reasons that
18     someone has the disease. And because -- they were
19     duplicative or super additive, or there could have
20     been another reason why they had a particular
21     disease in general. And so, you look at that in the
22     same way that you look at someone with heart
23     disease. You would say do they have diabetes and
24     hypertension? They could both contribute.
25 Q.  So, when you asked yourself that question, if

Page 202

1  Jacqueline Moline, MD - Cross
2  Q. Well, you mainly read and rely upon Dr.
3  Longo's testing and his reports, correct?
4  A. No, I wouldn't say that. I rely on Dr.
5  Compton's reports, as well as others.
6  Q. I understand. But you rely on -- you rely on
7  both Dr. Compton and Dr. Longo's reports as
8  presented to you by Plaintiff's counsel, right?
9      MR. DIMUZIO: Objection to form.
10 Asked and answered.
11 A. I have relied on both of their reports, yes.
12 Q. And if --
13     MR. DIMUZIO: Counsel, it's 4:59.
14 I think Dr. Moline has got to go. We can make some
15 statements about reserving rights and that sort of
16 thing. But I think it's about time for the depo to
17 end, given her time commitment.
18     MR. THACKSTON: Well, let me just
19 ask one last question.
20 Q. If you assume for me Dr. Compton said he found
21 anthophyllite in those six samples and Dr. Longo
22 says there are no amphiboles in those six samples,
23 who do you rely on?
24     MR. DIMUZIO: Objection. Form.
25 Incomplete hypothetical. Lack of foundation.

Page 203

1  Jacqueline Moline, MD - Cross
2  A. Again, I'm going to have to look at both of
3  the reports and probably have a discussion with them
4  to figure out why there's a discrepancy.
5  Q. Okay.
6     Doctor, we certainly hold open the deposition
7  to continue it at another time. Thank you very much
8  for your time today.
9      THE VIDEOGRAPHER: We are off the
10 record at 5 p.m., and this concludes today's
11 testimony given by Dr. Jacqueline Moline. The total
12 number of media units used is five and will be
13 retained by Priority-One, a Veritext company.
14 Thanks everybody.
15     (Deposition Adjourned.
16     Time Noted: 5:00 p.m.)

Page 204

A C K N O W L E D G E M E N T
STATE OF
COUNTY OF

I, the undersigned, hereby certify that I have read the transcript of my testimony taken under oath in my deposition; that the transcript is a true and complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

_____
JACQUELINE MOLINE, MD

Signed and subscribed to and before me
This _____ day of _____, 2022

_____
NOTARY PUBLIC

Page 205

C E R T I F I C A T E
STATE OF NEW YORK    )
COUNTY OF NEW YORK   )

I, ELEANOR SEKULIC, a Notary Public of the State of New York, do hereby certify that the foregoing deposition of JACQUELINE MOLINE, MD was taken by and before me on July 6, 2022.
    The said witness was duly sworn before the commencement of her testimony, the said testimony was taken stenographically by myself and then transcribed. The within transcript is a true record of the said deposition.
    I am not connected by blood or marriage with any of the said parties, nor interested directly or indirectly in the matter in controversy, nor am I in the employ of any of the Counsel.

DATED:_____

*Eleanor Sekulic* (signature)

_____
ELEANOR SEKULIC