# Exhibit 10

```
       IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
            FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
                     CIVIL TRIAL DIVISION

                            - - -

HOLLY FISHER, EXECUTRIX OF THE:  JULY TERM, 2019
ESTATE OF SANDRA REICHART,    :
                              :
          Plaintiff,          :
                              :
     vs.                      :
                              :
AMERICAN INTERNATIONAL        :
INDUSTRIES, individually and  :
as successor-in-interest for  :
the CLUBMAN BRAND, and to THE :
NESLEMUR COMPANY and PINAUD   :
COMPANY, et al.,              :
                              :
          Defendants.         :  NO.:  0877

                            - - -

              Thursday, October 13, 2022
                 Courtroom 675, City Hall
                 Philadelphia, Pennsylvania

                            - - -

BEFORE:  THE HONORABLE SIERRA THOMAS STREET, J.

                            - - -

                         JURY TRIAL
                         P.M. SESSION

                            - - -

REPORTED BY:  Kimberly Wilson, RMR, CRR

                            - - -
              KIMBERLY A. WILSON, RMR, CRR
                  OFFICIAL COURT REPORTER
             100 SOUTH BROAD STREET, 2ND FLOOR
                  PHILADELPHIA, PA  19110
              kimberly.wilson@courts.phila.gov
                      (215) 683-8010
```

---

```
APPEARANCES:

     JAMES KRAMER, ESQUIRE,
     DONALD P. BLYDENBURGH, ESQUIRE,
     OLIVIA KELLY, ESQUIRE,
     Simmons Hanly Conroy
       112 Madison Avenue
       New York, NY  10016-7416
     212-784-6279
     jkramer@simmonsfirm.com
     okelly@simmonsfirm.com
     dblydenburgh@simmonsfirm.com

     Counsel for Plaintiff


     ERIC D. COOK, ESQUIRE,
     Willcox Savage
       Wells Fargo Center
       440 Monticello Avenue, Suite 2200
       Norfolk, Virginia  23510
     757-628-5661
     ecook@wilsav.com

     DAVID W. SNYDER, ESQUIRE,
     McGivney Kluger Clark & Intoccia, P.C.
       1650 Arch Street, Suite 1800
       Philadelphia, PA  19103
     215-557-1990
     dsnyder@mkcilaw.us.com

     Counsel for Defendant, Whittaker, Clark &
       Daniels, Inc.
```

---

```
APPEARANCES:  (Cont'd.)

     ROBERT E. THACKSTON, ESQUIRE,
     Lathrop GPM
       2101 Cedar Springs Road
       Suite 1400
       Dallas, TX  75201
     469-983-6023
     robert.thackston@lathropgpm.com

     ROY F. VIOLA, JR., ESQUIRE,
     Gordon & Rees
       18 Columbia Turnpike
       Suite 220
       Florham Park, NJ  07936
     973-822-1110
     rviola@grsm.com

     Counsel for Defendant, American International
       Industries, successor-in-interest for the
       Clubman Brand, and to The Neslemur Company
       and Pinaud Company
```

---

```
                       I N D E X

               P L A I N T I F F ' S   E V I D E N C E

WITNESS                             DR    CR    RD    RC

Dr. Jacqueline Moline, M.D.         --     5    88    99
Holly Fisher                       106    --    --    --
```

37

Dr. Jacqueline Moline, M.D. - Cross

1  BY MR. THACKSTON:
2  Q.    And, in fact, the only denial was that the
3  defendant that she made the claim against denied
4  that they were liable, right?
5  A.    I haven't memorized the entire file that
6  you're speaking about. I know that there was a
7  dispute whether there was exposure. And I'm not
8  quite sure at how far it proceeded or if it was
9  withdrawn at a certain point.
10 Q.    Well, no matter how it ended up, it started
11 out with someone saying under oath that they were
12 exposed to asbestos other than cosmetic talc,
13 right?
14             MR. KRAMER:    Objection. What are we
15     talking about?
16             THE COURT:    Overruled. Counsel, you
17     know exactly what we are talking about. And
18     you objecting is not going to stop it.
19             THE WITNESS:    I'm sorry. Can you
20     repeat the question?
21 BY MR. THACKSTON:
22 Q.    No matter how it turned out, it started out,
23 the Workers' Compensation claim started out with
24 the plaintiff saying under oath that she was
25 exposed to asbestos on the job other than cosmetic

38

Dr. Jacqueline Moline, M.D. - Cross

1  talc, right?
2  A.    I don't know what -- how the process starts in
3  the state that this individual lived in, if it was
4  just the lawyer making an assertion or whether it
5  was the individual. I do not have a specific
6  recollection of the rules and regulations since
7  they're state by state.
8  Q.    You have been shown the claim before with the
9  signature by the husband, right?
10 A.    I'm sure you have shown it to me in the past.
11 I don't -- but it's been years. And the husband is
12 not the individual. And the individual would have
13 known the exposure more than a husband.
14 Q.    Have you ever done any work for the Graham and
15 Wallace law firm in Salisbury, North Carolina?
16 A.    No.
17 Q.    Weren't you a retained expert in the Bell
18 case?
19 A.    I was an expert in the Bell case, but I was
20 not retained -- I don't recall that I was -- I was
21 not retained by that firm. I don't know that firm.
22 Q.    Okay. So after you wrote this article based
23 on these litigation cases, and you testified about
24 these articles on direct examination, and you said
25 there's no epidemiology -- well, let me back up.

39

Dr. Jacqueline Moline, M.D. - Cross

1  There's no epidemiology suggesting that barbers or
2  hairdressers are at an increased risk for
3  mesothelioma, right?
4  A.    No such study has yet been conducted. It
5  doesn't mean that it isn't true. But there has not
6  been a specific study that I have seen that is
7  specifically looking at barbers and hairdressers.
8  Q.    Well, we'll get to that. Okay.
9        And so you said that my study is significant
10 because I got these 33 people who were only exposed
11 to cosmetic talc and they got meso, right?
12 A.    I said my study was significant because it was
13 pointing to cosmetic talc as a cause of
14 mesothelioma and alerting physicians that they
15 should take a history. If you read the conclusion,
16 that's the point of this article.
17 Q.    After you testified about your article to
18 juries, if somebody who's cross-examining you wants
19 to make sure that that's right, that in those 33
20 cases there was no other exposure -- alleged
21 exposure to asbestos, you take the position that
22 you won't disclose the names of any of those cases,
23 right?
24 A.    I take that position regardless of what
25 situation I'm in. I do not disclose the names of

40

Dr. Jacqueline Moline, M.D. - Cross

1  individuals. That is standard medical practice.
2  That is standard research practice. I am not doing
3  anything different from any colleague that I know
4  at any institution.
5             MR. THACKSTON:    Object to
6     responsiveness about what colleagues do.
7             THE COURT:    Overruled.
8  BY MR. THACKSTON:
9  Q.    Well, let's take that a step at a time. So
10 you're not they're treating physician. You have no
11 physician-patient relationship with any of the 33,
12 right?
13            MR. KRAMER:    Objection, Judge. This
14     is now going into questioning regarding
15     whether or not or how she may -- the reason
16     why she's not going to be revealing these
17     individuals. And when we had this
18     conversation, counsel said he was not --
19            THE COURT:    I agree, he did say
20     that.
21            MR. THACKSTON:    I'm sorry, Your
22     Honor?
23            THE COURT:    You did say that you
24     were limited to the issue that you have
25     already touched. Sustained.

### Dr. Jacqueline Moline, M.D. - Cross — 41

1  BY MR. THACKSTON:
2  Q.  The position -- well, Northwell, your
3  employer, is the one that has the information,
4  right?
5          MR. KRAMER:  Same objection, Judge.
6          THE COURT:  What's the purpose of
7      the question?
8          MR. THACKSTON:  I'm sorry, Your
9      Honor?
10         THE COURT:  What's the purpose of
11     this question, Counsel?
12         MR. THACKSTON:  I'm so sorry?
13         THE COURT:  What is the purpose of
14     this question?
15         MR. THACKSTON:  Oh.  The purpose of
16     the question is that the information has
17     already been released by Northwell.
18         THE COURT:  Okay.  Well, why don't
19     you ask that.
20 BY MR. THACKSTON:
21 Q.  Northwell has already produced the records
22 that shows that Mrs. Bell was a member of your
23 study, right?
24 **A.  I -- what my organization might have done, I**
25 **will not discuss.  I will not discuss names of the**

### Dr. Jacqueline Moline, M.D. - Cross — 42

1  individuals in my paper.
2  Q.  And you testified earlier about Workers'
3  Compensation orders.  Have you read -- you're aware
4  that there's a 40-page order from a federal court
5  saying that your position that you can't talk about
6  those people is wrong, right?
7          MR. KRAMER:  Objection, Judge.
8          THE COURT:  Sustained.
9  BY MR. THACKSTON:
10 Q.  Have you read that opinion yet?
11         MR. KRAMER:  Objection.
12         THE COURT:  Sustained.
13 BY MR. THACKSTON:
14 Q.  All right.  In the denial --
15         MR. THACKSTON:  May I approach, Your
16     Honor?  May I display the denial that she's
17     talking about?
18         MR. KRAMER:  We object, Your Honor.
19         THE COURT:  Denials of?
20         MR. THACKSTON:  The last question.
21         THE COURT:  Can you come over here?
22     I don't know what you're talking about.
23 BY MR. THACKSTON:
24 Q.  The only denial in that Workers' Compensation
25 claim -- I'm going to represent to you that my

### Dr. Jacqueline Moline, M.D. - Cross — 43

1  information is the only denial is the defendant
2  saying, "We deny the claim."
3      Are you aware of a judicial order finding that
4  Mrs. Bell's Workers' Compensation claim was
5  unfounded?
6          MR. KRAMER:  Same objection.
7          THE COURT:  Overruled.
8          THE WITNESS:  My understanding was
9      that there was a dispute and then either the
10     case was withdrawn or there was a decision.  I
11     may be misremembering, but I know it did not
12     go any further than that.  That there was a
13     dispute that there was any exposure.  I
14     thought it went and either a judge made that
15     determination or the case was withdrawn at
16     that point.  And no further action was taken.
17     So that's my recollection.  I don't know.
18 BY MR. THACKSTON:
19 Q.  Would you want that shown to the jury, if
20 there is such a thing, would you want that shown to
21 the jury in this case to back you up on that?
22 **A.  Which thing?**
23 Q.  If there is any such thing as an order finding
24 that Mrs. Bell's Workers' Compensation claim was
25 unfounded, would you want to jury to see that in

### Dr. Jacqueline Moline, M.D. - Cross — 44

1  this case?
2  **A.  We're not here talking about Mrs. Bell.  We're**
3  **here talking about Mrs. Reichart.  I would like the**
4  **jury to hear about Ms. Reichart and not about**
5  **another case.**
6          THE COURT:  Well, since I'm going to
7      decide what the jury hears, objection
8      sustained on that question.  If you have
9      something that you want to approach the
10     witness with, you may approach the witness
11     with.
12         The reason why you're being asked
13     about Ms. Bell was because she's part of your
14     study.  So it's not totally irrelevant.
15         Next question.
16 BY MR. THACKSTON:
17 Q.  And I happen to know something about the Bell
18 case because I was involved in it.  For the other
19 32 cases, you haven't released any identification
20 information on those 32 cases either?
21         MR. KRAMER:  Objection, Your Honor.
22         MR. THACKSTON:  It's the last
23     question.
24         MR. KRAMER:  I still object to it.
25     It could be three questions from the end.

## Page 45

**Dr. Jacqueline Moline, M.D. - Cross**

1 THE COURT: It's asked and answered.
2 I mean, she said she --
3 MR. THACKSTON: Okay.
4 THE COURT: Sustained, Counsel.
5 MR. THACKSTON: Okay.
6 BY MR. THACKSTON:
7 Q. Now, Doctor, one of the things that your
8 article -- your article says that there were -- was
9 it three hairdressers in your study?
10 **A. Yes.**
11 Q. Okay. And is this your article that I have on
12 the screen now?
13 **A. I'm sorry, I didn't hear what you said.**
14 Q. Is this your article that I have up on the
15 screen?
16 **A. Yes.**
17 Q. And one of the things you say that's
18 highlighted over here on the right is that, "The
19 high prevalence of unexplained or idiopathic
20 mesothelioma among women necessitates further
21 inquiry into the potential non-occupational
22 exposures such as exposure to asbestos contaminated
23 talcum powder." Right?
24 **A. Yes.**
25 Q. So you note the -- you note the occupations of

## Page 46

**Dr. Jacqueline Moline, M.D. - Cross**

1 a few of these people. One of the parts of the
2 paper deals with what you call fiber burden
3 studies, right?
4 **A. There were six cases that had tissue**
5 **evaluated.**
6 Q. It says -- your article says, "While fiber
7 burden studies are rarely undertaken in the course
8 of clinical treatment, and they're used primarily
9 for medico-legal purposes, the finding of various
10 fibers in the lung tissues can provide guidance on
11 potential prior asbestos exposure, et cetera"
12 Right?
13 **A. Yes.**
14 Q. Do you know whether there has been any fiber
15 burden analysis done of Mrs. Reichart's tissue?
16 **A. I haven't seen any.**
17 Q. Now, you reference in your papers something
18 called a mesothelioma registry?
19 **A. Can you point me to what you're talking about?**
20 Q. Do you remember mentioning the Italian
21 mesothelioma registry?
22 **A. Yes.**
23 Q. And you say that -- you say, quote, "Typically
24 patients with mesothelioma will be simply asked
25 whether they worked with or around asbestos, rather

## Page 47

**Dr. Jacqueline Moline, M.D. - Cross**

1 than being provided with a listing of potential
2 sources of the types of exposure in which one might
3 encounter asbestos. Cases of mesothelioma among
4 hairdressers characterized as idiopathic, also
5 underscore the contribution of an incomplete
6 exposure history. The potential failure to
7 identify use of talcum powder exposure in their
8 work would prevent the linking of occupational
9 exposures to asbestos in their mesothelioma. In
10 our paper, there were three female hairdressers who
11 regularly used talcum powder in their work."
12 Right?
13 **A. Correct.**
14 Q. But then you say, "It was unclear from any of
15 the histories noted in the medical records that
16 these women were asked if they used talcum powder
17 as part of the haircutting process." And you say,
18 "In a report from the national mesothelioma
19 registry of Italy" -- now, that's like a listing of
20 all the mesothelioma cases in Italy, right?
21 **A. Yes.**
22 Q. "Staff noted a cluster of mesothelioma due to
23 unknown exposure among a hairdressers, but they
24 examined hairdryer use as a potential exposure."
25 Right?

## Page 48

**Dr. Jacqueline Moline, M.D. - Cross**

1 **A. Correct.**
2 Q. Because hairdryers at one time contained
3 asbestos, right?
4 **A. Some of them might have, not all of them.**
5 Q. And they have a fan in them that blows air
6 through them, right?
7 **A. I'm not a hairdryer expert.**
8 Q. You're not aware of whether a hairdryer has a
9 fan in it?
10 **A. I'm not going to comment on the mechanics of a**
11 **hairdryer.**
12 Q. And so in your article you're saying there's
13 no other possible exposure to asbestos. But then
14 you mention hairdressers. And then you cite an
15 article that says, a source of asbestos exposure to
16 hairdressers could be hairdryers. Right?
17 THE COURT: Can you put that back
18 up, please? There's no objection, but you
19 didn't read the complete sentence in there.
20 MR. THACKSTON: Only examine
21 hairdryer use as a potential exposure. No
22 discussion of the occupational use of talcum
23 powder. Footnote 51.
24 THE COURT: If you're going to read
25 to the jury, read completely every word.