**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**PENINSULA PATHOLOGY**
**ASSOCIATES,**

                **Plaintiff,**

**v.**                                      **Case No. 4:22-mc-1**

**AMERICAN INTERNATIONAL**
**INDUSTRIES,**

                **Defendant.**

## <u>ORDER</u>

This matter is before the court on Peninsula Pathology Associates' ("Peninsula") motion to quash a third-party subpoena from American International Industries ("AII"). (ECF No. 1). Peninsula "is a medical practice that has been providing pathology services to physicians throughout Eastern Virginia for more than 50 years." Mem. Supp. Mot. Quash ("Peninsula's Mem.") (ECF No. 2, at 4). AII, a manufacturer of cosmetic products, served Peninsula with the third-party subpoena at issue in connection with <u>Gref v. Am. Int'l Indus., et al.</u>, No. 1:20-cv-5589, which is currently being litigated before the United States District Court for the Southern District of New York. <u>Id.</u> at 5–6. In that case, which was filed in July 2020, AII faces allegations from plaintiff Brian Gref that he developed mesothelioma as a result of repeated exposure to asbestos from using cosmetic talc products manufactured by AII and other named defendants. <u>Id.</u>

Peninsula is not involved in the <u>Gref</u> litigation. <u>Id.</u> at 6. However, its employee, Dr. Theresa S. Emory, co-authored an article in February 2020 entitled "Malignant mesothelioma following repeated exposures to cosmetic talc: A case series of 75 patients" ("the Article"). <u>Id.</u> at

4–5.  The Article, which was also co-authored by Dr. John C. Maddox—another Peninsula employee—and Dr. Richard L. Kradin, analyzes the medical and legal records of 75 individuals with malignant mesothelioma whose only known, reported exposure to asbestos came from cosmetic talcum powder.  Id. at 5.  In the Article, which was published in March of 2020 in the American Journal of Industrial Medicine, the authors' brief analysis concludes that "cosmetic talc may be a cause of malignant mesothelioma," and that "[l]arge-scale controlled studies will be required to assess the prospective risk of developing mesothelioma following repeated exposures to talc." Peninsula's Mem., Ex. 2 (ECF No. 2-2, at 11).

Mr. Gref's experts, Dr. Jacqueline Moline and Dr. Murray Finkelstein, have each opined that Mr. Gref developed malignant mesothelioma as a result of exposure to cosmetic talc.  AII's Opp'n, Ex. H (ECF No. 4-8, at 23); AII's Opp'n, Ex. I (ECF No. 4–9, at 280).   Both experts submitted detailed expert reports in support of their opinions.   The reports contain detailed summaries of Gref's medical treatment and diagnoses, the extensive medical evidence linking mesothelioma to asbestos exposure, and descriptions of the study of asbestos in talc and cosmetic talc products.  AII's Opp'n, Ex. H (ECF No. 4-8, at 4–24); AII's Opp'n, Ex. I (ECF No. 4–9, at 3–280).  Both reports also rely on and cite the Article briefly.  AII's Opp'n, Ex. H (ECF No. 4-8, at 22 n.2); AII's Opp'n, Ex. I (ECF No. 4–9, at 233).

On November 7, 2022, AII served the third-party subpoena on Peninsula seeking to uncover documents relating to (1) "the Article and underlying study;" (2) "Peninsula and Dr. Emory's billing documents, income, and other financial records;" and (3) "SDNY plaintiff Mr. Gref." Id. at 6–7.  Peninsula responded by filing the instant motion to quash on November 18, 2022. (ECF No. 1).  Peninsula argues that AII's subpoena should be quashed under Federal Rule of Civil Procedure 45(d), Peninsula's Mem. (ECF No. 2, at 12–17), which states that a court "must

quash or modify a subpoena that . . . subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv).  AII opposed Peninsula's motion, (ECF No. 4), and Peninsula replied, (ECF No. 8).  The court held a hearing on the motion via Zoom on December 16, 2022.  For the reasons stated on the record and discussed briefly below, after reviewing the parties' briefs and arguments, the court GRANTS Peninsula's motion to quash.

Federal Rule of Civil Procedure 26(b) limits the scope of civil discovery by requiring that all material sought be both "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).  When assessing whether these two requirements—relevance and proportionality—have been satisfied in a particular case, courts must consider, among other things, "whether the burden or expense of the proposed discovery outweighs its likely benefit." See id.; Va. Dep't of Corr. v. Jordan, 921 F.3d 180, 189 (4th Cir. 2019).  However, "[w]hen discovery is sought from nonparties" in particular, "its scope must be limited even more" beyond this standard Rule 26(b) analysis.  Jordan, 921 F.3d at 189.  Additional limitation is necessary because nonparties "have 'no dog in [the] fight,'" and therefore "have 'a different set of expectations from the parties themselves." Id. (quoting Cusumano v. Microsoft Corp., 162 F.3d 708, 717 (1st Cir. 1998)).  In short, "[n]onparties faced with civil discovery requests deserve special solicitude" and "should not be drawn into the parties' dispute unless the need to include them outweighs the burdens of doing so, considering their nonparty status." Id. at 194.

In light of these concerns, "[a] more demanding variant of the [Rule 26(b)] proportionality analysis . . . applies when determining whether, under Rule 45, a subpoena issued against a nonparty 'subjects a person to undue burden' and must be quashed or modified." Id. at 189 (quoting Fed. R. Civ. P. 45(d)(3)(A)(iv)).  "As under Rule 26, the ultimate question is whether the benefits of discovery to the requesting party outweigh the burdens on the recipient," but the inquiry

3

is "even more demanding and sensitive . . . than the one governing discovery generally" on account of the subpoena recipient's nonparty status. Id. (citing In re Mod. Plastics Corp., 890 F.3d 244, 251 (6th Cir. 2018); Citizens Union of N.Y.C. v. Att'y Gen. of N.Y., 269 F. Supp. 3d 124, 138 (S.D.N.Y. 2017); In re Pub. Offering PLE Antitrust Litig., 427 F.3d 49, 53 (1st Cir. 2005)) (cleaned up).

Several factors are pertinent to this weighing analysis. When assessing the benefit to the requesting party, courts should consider, among other things:

> the relevance of the information sought [and] the requesting party's need for it. The information sought must likely (not just theoretically) have marginal benefit in litigating important issues[1].... Courts should also consider what information is available to the requesting party from other sources. To that end, the requesting party should be able to explain why it cannot obtain the same information, or comparable information that would also satisfy its needs, from one of the parties to the litigation—or, in appropriate cases, from other third parties that would be more logical targets for the subpoena.

Id. (citations omitted). Likewise, when assessing the burden to the recipient, courts should consider, among other things, the financial cost of producing the information as well as "other cognizable burdens," such as (1) the impact of production on privacy or confidentiality interests; (2) the interests—including business interests—of the recipient and others who might be affected; and (3) whether the subpoena is overbroad and would require "tailoring" by the nonparty. Id. at 189–90.

Weighing these factors, I find that the benefits of the subpoenaed material to AII are significantly outweighed by the burdens on Peninsula and Dr. Emory in responding to the

---

[1] "Marginal benefit" simply means that "the information must offer some value over and above what the requesting party already has." Jordan, 921 F.3d at 189.

subpoena. With respect to the benefit of the information to AII, it's crucial that neither Peninsula nor Dr. Emory are involved in the Gref litigation. Dr. Emory has not been named as a witness or deposed. And although Dr. Emory sometimes consults in mesothelioma cases—primarily for plaintiffs—there is no evidence she has consulted with Gref. Though AII speculated that Gref may have consulted with Peninsula, it made no factual proffer to that effect despite its ready access to discovery from him.[2] And AII has waited until now, over two years into the Gref litigation, to request that Peninsula produce the information listed in the subpoena. While Dr. Moline and Dr. Finkelstein do cite the Article in their respective expert reports, they do so minimally—Dr. Moline cites the Article at the end of a string-cite in a single footnote, AII's Opp'n, Ex. H (ECF No. 4-8, at 23), while Dr. Finkelstein's mention of the Article in his 292-page report accounts for a half page, most of which is devoted to reproducing the results of 11 tissue digestion studies appearing in the Article, AII's Opp'n, Ex. I (ECF No. 4–9, at 233). Additionally, comparing Mr. Gref's age and date of diagnosis to the corresponding data for the participants in the Article's underlying study—which are already disclosed in the text of the piece itself—it is plain that Mr. Gref was not one of Dr. Emory's subjects. See AII's Opp'n, Ex. E (ECF No. 4-5, at 4–6). All of this evidence points to the conclusion that the information AII seeks is minimally relevant to their defense in the Gref litigation.

---

[2] At the hearing, AII argued at length that, although Dr. Emory is not an expert in the Gref litigation, the requested information is nonetheless relevant because Dr. Emory's article is a driving "linchpin" of modern talc litigation. However, the question before the court is not whether the Article is relevant to talc litigation generally, but whether it is relevant to the case at hand—which is Mr. Gref's pending action in the Southern District of New York. As such, I make no findings about the relevance of Dr. Emory's article to talc litigation generally, whether the subpoena would be proper in a different talc case, or whether the subpoena would be proper if Dr. Emory or one of her co-authors had been named as an expert witness in the Gref litigation.

AII has also failed to explain why it cannot obtain from other sources "comparable information that would also satisfy its needs" for impeachment of Dr. Moline and Dr. Finkelstein at trial. See Jordan, 921 F.3d at 189. The company argues that it requires the identities of Dr. Emory's research subjects to try and prove they had other exposures to asbestos fibers that might undermine the Article's conclusion that their mesothelioma "may" have been caused by exposure to talc. But there is already extensive information on the face of the Article that AII can use to attack the Article's conclusion, and its support for the opinions offered by Gref's experts. For example, Dr. Emory disclosed that she has "testified in asbestos litigation, primarily for plaintiffs," and that her 75 subjects anonymously reported by the Article were derived from "medical-legal consultation." See AII's Opp'n, Ex. E (ECF No. 4-5, at 2, 7). Thus, as AII's counsel has argued, there is ample basis to suggest that the self-selected sample of litigation subjects is poorly reflective of the universe of people exposed to cosmetic talc. In light of these facts, I am persuaded that the additional information sought by subpoena would be minimally beneficial to AII in the Gref litigation.

With respect to the burdens on Peninsula and Dr. Emory, AII has made dozens of document requests intended to encompass any and all records associated with the Article, Peninsula's and Dr. Emory's finances, and Mr. Gref. The overbreadth of these requests, especially given the minimal relevance of the information sought, is apparent on the face of the subpoena. Peninsula's president, Dr. David M. Smith, confirmed in his affidavit that the financial and logistical costs of gathering these documents and/or reasonably tailoring the production would be significant. Mot. Quash, Ex. 1 (ECF No. 1-2, at 3) ("Responding to the Subpoena, which contains many requests concerning the Article, Peninsula's correspondence with various individuals, Peninsula's financial records, and additional materials, would be burdensome and costly, and would divert time and

6

resources from Peninsula's busy medical practice."). And although, at oral argument, AII limited its demand to a list of the names of the participants in the Article's study, Dr. Emory stated in her affidavit that producing documents identifying those individuals would constitute a violation of the medical ethics rules by which she is bound as a board-certified physician. Peninsula's Mem., Ex. 2 (ECF No. 2-2, at 4). In light of these facts, I am persuaded that compliance with AII's subpoena would force Peninsula and Dr. Emory to bear heavy burdens, both financially and professionally. Consequently, I conclude that AII's subpoena imposes an undue burden and therefore must be quashed under Rule 45(d)(3)(A)(iv).

In its brief filed in support of its motion, Peninsula also argues that AII's subpoena warrants sanctions under Rule 45(d)(1). Peninsula's Mem. (ECF No. 2, at 20–23). Rule 45(d)(1) imposes a duty on those issuing subpoenas to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P. 45(d)(1). The court "must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply." Id. (emphasis added). In its briefing, AII did not address the sanctions argument except to argue that Peninsula had not demonstrated "bad faith." AII's Opp'n (ECF No. 4, at 25 n.12). However, while the court must find bad faith when imposing sanctions under its inherent authority, when acting under Rule 45(d)(1), bad faith is not required. See Mount Hope Church v. Bash Back!, 705 F.3d 418, 428 (9th Cir. 2012) ("[B]ad faith is sufficient to invoke Rule 45(c)(1)[3] sanctions. But we have never stated that bad faith is necessary, and we do not do so now. More precisely, bad faith is a sufficient ground for sanction, but it is not a necessary ground if Rule 45(c)(1) is otherwise violated . . . ."); In re Mod. Plastics

---

[3] Formerly, and at the time of the Ninth Circuit's decision in Mount Hope Church, the text of the current Rule 45(d)(1) was found in Rule 45(c)(1).

Corp., 890 F.3d 244, 251 (6th Cir. 2018) (rejecting appellants' argument "that sanctions may not be imposed under Rule 45(d)(1) absent a finding of bad faith" because "neither case [cited by appellants] supports a bad-faith requirement"); Jiangmen Kinwai Furniture Decoration Co. Ltd. v. IHFC Properties, LLC, No. 1:14-CV-689, 2015 WL 12911773, at *1–2 (M.D.N.C. Oct. 27, 2015) (finding that, "[w]hile not necessary to the Court's decision" to award sanctions under Rule 45(d)(1) for an unduly burdensome subpoena, the plaintiff and its attorney had acted in bad faith and could be subjected to sanction under the court's inherent authority). In light of my findings above, I conclude that AII and its attorneys have failed to "take reasonable steps to avoid imposing undue burden or expense" on Peninsula. See id. Consequently, sanctions are warranted under Rule 45(d)(1). The court will take the issue of sanctions under advisement and issue a separate order following requested briefing on the fees incurred matter.

For the foregoing reasons, this court GRANTS Peninsula's motion to quash. Additionally, to aid the court in its determination of the appropriate sanctions under Rule 45(d)(1), the court hereby ORDERS Peninsula to file a sworn statement of its costs and fees by **January 4, 2023**, and ORDERS AII to file its response by **January 18, 2023**.

_____ /s/ _____

Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
December 23, 2022